UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>v.<br><br>JONATHAN WEBB,<br><br><br>　　　　Defendant, | **Civil Action No.** |

## COMPLAINT

Plaintiff, United States Securities and Exchange Commission ("SEC" or "Commission") alleges as follows against Defendant Jonathan Webb ("Defendant" or "Webb").

## SUMMARY

1.　　　Massachusetts resident Jonathan Webb conducted a securities offering fraud that included Ponzi-like payments to some investors and use of investor money for personal purposes.  From at least January 2021 to August 2023, Webb solicited and accepted approximately $1.7 million dollars from at least 34 people for "investment purposes."  Many of the investors lacked financial and/or investment experience.  Many also worked for Webb at a Massachusetts cemetery.  Several investors did not speak English and many were low-income workers who could not afford to invest and risk losing the money they entrusted to Webb.

2.　　　Webb falsely told investors he could double their money within a year by pooling it and investing in the foreign currency exchange market (Forex), and guaranteed the return of the capital and any interest earned.  For prospective investors who did not have tens of thousands of dollars to invest, Webb helped them to secure personal loans that enabled them to invest with

him.  He even promised to make the monthly loan payments on their behalf.  Webb then converted investor funds to crypto assets and transferred the converted funds to overseas brokerage firms.  That permitted Webb to invest in the Forex market using up to 500:1 leverage and an algorithmic trading program Webb had purchased on the internet.

3.     Webb lost hundreds of thousands of dollars in investor funds using the trading program.  Despite these losses, he continued to solicit and accept investor funds, falsely guaranteeing the return of capital and promising exorbitant potential returns.

4.     Webb lost most of the investor funds investing in Forex.  In addition, despite promising to use the investor funds for investment purposes, used some investor funds to pay back some earlier investors.  He also misappropriated investor funds for personal expenses.

## **VIOLATIONS**

5.     By virtue of the conduct alleged herein, Webb violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), (2), and (3)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §§240.10b-5(a), (b), and (c)].

## **NATURE OF THE PROCEEDING AND RELIEF SOUGHT**

6.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)].

7.     The Commission seeks a final judgment: (a) permanently enjoining Webb from violating the federal securities laws by engaging in transactions, acts, practices, and courses of business of the type alleged in this Complaint; (b) permanently enjoining Webb from, directly or indirectly, including but not limited to, through any entity owned or controlled by him,

participating in the purchase, offer, or sale of any security to investors or potential investors, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts; (c) ordering Webb to disgorge any ill-gotten gains with prejudgment interest thereon, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(5) and (7)]; (d) ordering Webb to pay a civil money penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and (e) ordering such other and further relief the Court may deem just and proper.

## DEFENDANT

8.      Jonathan Webb ("Webb"),  age 49, is a resident of Tewksbury, Massachusetts. Webb was employed at a cemetery in Massachusetts in various horticultural and arboricultural positions from 1994 through 2024.  Webb is currently employed at a different cemetery in Massachusetts.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§77t(d)(1) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].  Venue lies in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  A substantial portion of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts.  Webb also resides in the district.

10.      In connection with the transactions, acts, practices, and courses of business alleged in this Complaint, Defendant, directly or indirectly, singly or in concert with others,

made use of the means or instrumentalities of transportation or communication in interstate commerce, or the mails.

## DEFENDANT'S ACTS IN VIOLATION OF THE FEDERAL SECURITIES LAWS

11.    Webb began working as an arborist at a Massachusetts cemetery in 1994 and by 2019 had become a supervisor of tree maintenance.  Webb had no investment experience or training beyond his workplace retirement account and his trading of securities in a personal trading account.

12.    In approximately 2019, Webb attended a two-week course for the purpose of learning about on-line trading in his personal accounts.  The second week of the on-line trading course focused on trading in the Forex market.  After taking the on-line trading course, Webb proceeded to use his own money to trade Forex, achieving both gains and losses over time.

13.    After attending the on-line trading course, Webb learned from on-line sources that if he used certain overseas brokerage firms he could trade Forex with leverage of up to 500:1. The term "leverage" at the overseas brokerage firms did not involve the customer borrowing funds to trade.  Rather, the firm allowed the customer to trade a larger position.  One overseas brokerage firm's website stated, "For example, with $1,000 in your trading account and leverage of 200:1, you can have trading capacity of $200,000."  Webb understood that this allowed for the potential of greater gains, but also increased the risk of loss.  The firms limited any losses to the initial investment.

14.    After attending the on-line trading course, Webb also read on-line information about "Forex Expert Advisors," software trading programs which claim to execute automatic Forex trading strategies according to a computer programmed algorithm.

15.    Webb particularly focused on the software trading program called "Barclays Expert Advisor," as it advertised gains of 15% per month over many years with very small

losses.  Webb's due diligence on the Barclays Expert Advisor software was limited to reviewing publicly available websites and the Barclays Expert Advisor website.  The only contact information listed on the Barclays Expert Advisor website was a WhatsApp Online Chat number. The website was hosted in Indonesia and the registrant's contact information is in Indonesia.  A well-known international financial institution known as Barclays plc or Barclays Bank has no connection with the website or with the Barclays Expert Advisor software.

16.     Webb discussed his Forex investments with employees of the cemetery and also with his church community where he was the president and a board member.  He told people that he could earn extravagant returns doing Forex trading and that they could as well.  He told the employees and church members that if they invested their money with him, he would return the money they invested plus any interest earned in one year.

17.     Beginning in at least January 2021, Webb began soliciting and accepting money from employees, church members and friends for purposes of investing in Forex.  Webb had known many of the investors as employees, church members or friends for decades.  Many of the employees were low-wage workers who reported to Webb at the cemetery.  Individuals invested tens of thousands of dollars with Webb.  When potential investors did not have the savings to invest, Webb helped individuals take out personal loans of as much as $50,000 and even promised to make the monthly payments owed on the loans.

18.     At least 34 individuals invested approximately $1.7 million with Webb from at from at least January 1, 2021 to August 2023.  Several of the investments were provided to Webb cash in-hand.  Webb had virtually no system for recording the names of investors, amounts invested, dates of investment, investment returns or amounts paid back to investors. Webb also did not keep track of nor did he record the amount of investor funds actually invested in Forex.

19.     For many investors, Webb drafted a one paragraph "Investment Agreement," which he and the investor signed electronically.  The agreements varied in specifics, but in general they provided that the investor was giving Webb an amount of money "for investment purposes."  The agreements further stated that at the end of one year, Webb would return the money they invested, or capital, plus any interest.  Most of the agreements falsely promised that the capital was "guaranteed," and provided an exorbitant "intended targeted interest."  For example, many agreements provided for a targeted annual return of 100% or 200%, and others provided for targeted monthly returns as high as 15% or 25%.  In a few instances, Webb promised to return the capital and a specified percentage return.  For example, some agreements promised that the capital plus an additional 35% would be guaranteed after one year.

20.     For investors who did not sign a written agreement, Webb falsely promised to double or triple their money within a year by investing in Forex.

21.     Webb knew or was reckless in not knowing that his guarantees to return investors' capital within a year with promises of exorbitant returns based on Forex trading were false.  Webb had never generated consistent annual returns in his own trading, and certainly not annual returns of 100%.  Webb's own trading record was far more mixed, with some gains and some losses.

22.     Webb's purported basis for guaranteeing a return of capital and projecting and promising extravagant returns was the on-line advertised returns he had seen for the Barclays Expert Advisor software, which he had purchased using crypto assets.  Webb did not know anyone personally who had actually used the software to trade in a real account.

23.     In order to execute his Forex trading plan, Webb opened accounts at overseas brokerage firms located in Dubai and St. Vincent and the Grenadines.  The overseas brokerage

firms provided Webb access to a platform for trading Forex, to which he was able to connect the Barclays Expert Advisor software.

24.    The overseas brokerage firms also allowed Webb to trade with up to 500:1 leverage.  Webb understood that there is always a risk of loss when investing and that the risk was greatly increased by using leverage.

25.    In order to make deposits at the overseas brokerage firms, Webb sent investor money to a U.S. based crypto asset trading platform, converted the U.S. dollars to crypto assets, and then transferred the crypto assets to the overseas brokerage firms.

26.    By at least the end of 2022, Webb's trading resulted in the loss of significant investor funds.  For example, the records from one overseas brokerage firm show that Webb lost approximately $100,000 during the first two days of November 2022.  Records from another overseas brokerage firm show that by March 2023, Webb had lost over $700,000.

27.    Even after losing significant investor funds in November 2022, Webb continued to solicit investments from employees, church members, and friends, and continued to falsely promise exorbitant returns of 100% or 200% per year and a guaranteed return of capital after one year.  Webb knew, based on his recent loss of investor funds, that his guarantee to return capital and promises of exorbitant returns were false.  As with previous investors, when some of those individuals did not have the funds to invest, Webb helped them apply for personal loans and promised to make monthly payments on the loans.  At least 14 different individuals made a total of more than $500,000 in investments with Webb after he had suffered large investment losses in November 2022.

28.    After losing significant investor funds, Webb tried different Forex trading strategies.  One of those strategies was using retail proprietary trading firms to trade Forex. These firms charge retail customers a fee to take a trading challenge.  If the customer passes the

trading challenge, which typically consists of trading Forex using simulated funds in a simulated market, he or she is given access to firm capital to trade in a "funded account."  At some proprietary trading firms customers with access to a funded account are able to trade in actual Forex markets, while at other firms customers with access to a funded account are only able to trade simulated funds in simulated Forex markets.  The customer then splits any profits generated from their trading with the firm.  However, if at any point the customer loses more than a pre-determined percentage of the funded account's value, the customer loses access to the funded account.  Webb sent investor funds to both types of proprietary trading firms.

29.     By August 2023, Webb had lost most of the investor money that had actually been invested in Forex.  These losses totaled more than one million dollars.

30.     However, Webb did not use all of the investor funds for "investment purposes." Despite promising to use the funds for investment purposes, Webb used some incoming investor funds from later investors to make payments to earlier investors.  He also misappropriated investor funds and used funds to pay for personal expenses.  Many of the payments to earlier investors were not for the repayment of their capital investment or investment returns, but rather to make monthly payments on  personal loans investors had taken out to invest with Webb.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**Violations of Section 17(a) of the Securities Act [15 U.S.C. 77q(a)]**

31.     The Commission realleges and incorporates by reference paragraphs 1 through 30 above, as if fully set forth herein.

32.     By engaging in the acts and conduct alleged above, Webb directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (1) employed devices, schemes, or artifices to defraud; (2) obtained money or property by means of untrue statements of material

fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (3) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers, in violation of Sections 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)].

**SECOND CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**[15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5]**

33.     The Commission realleges and incorporates by reference paragraphs 1 through 30 above, as if fully set forth herein.

34.     By engaging in the acts and conduct alleged above, Webb, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchases and sellers of securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court find Defendant committed the violations alleged, and:

A.      Enter a Final Judgment permanently restraining and enjoining Webb, as well as his agents, servants, employees, attorneys, and other persons in active concert or participation with them, from directly or indirectly engaging in the conduct described above, or in conduct of similar purpose and effect, in violation of:

      1.      Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and

      2.      Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

B.      Enter a Final Judgment permanently restraining and enjoining Webb from, directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts.

C.      Enter a Final Judgment ordering Webb to disgorge his ill-gotten gains or unjust enrichment, with prejudgment interest thereon, to effect the remedial purposes of the federal securities laws.

D.      Enter a Final Judgment ordering Webb to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

E.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered.

F.      Grant such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury trial in this action for all claims so triable..

Dated:  March 13, 2025                    Respectfully submitted,

                                          SECURITIES AND EXCHANGE COMMISSION

                                          By its attorneys,


                                          //s//  Martin F. Healey
                                          Martin F. Healey (BBO# 227550)
                                          Kerry Dakin (BBO# 640826)
                                          Jeffrey Olshan (BBO# 693337)
                                          Boston Regional Office
                                          33 Arch Street, 24th Floor
                                          Boston, MA  02110
                                          Phone:         (617) 573-8900
                                          Facsimile:     (617) 573-4590
                                          Healey Email:  HealeyM@sec.gov
                                          Healey Phone: (617) 573-8952